## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| REBECCA BLY<br>3900 Connecticut Avenue, N.W.<br>Washington, DC 20008,<br>on behalf of herself and all others similarly<br>situated,<br><br>Plaintiff,<br><br>v.<br><br>NVIDIA CORPORATION<br>2701 San Tomas Expressway<br>Santa Clara, California 95050<br><br>ATI TECHNOLOGIES, INC.<br>1 Commerce Valley Drive East<br>Markham, Ontario<br>Canada L3T 7X6<br><br>ADVANCED MICRO DEVICES, INC.<br>One AMD Place<br>P.O. Box 3453<br>Sunnyvale, California 94088-3453<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff Rebecca Bly, by her attorneys, brings this civil action for damages and injunctive relief on behalf of herself and all other similarly situated against the above-named Defendants[1] and, demanding a trial by jury, complains and alleges as follows:

---

[1] "Defendants" means each of the above-captioned Defendants who, individually, and collectively through their combination and conspiracy, perpetrated the wrongful conduct complained of herein.

## JURISDICTION AND VENUE

1.      This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. §26, to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and under state statutory and unjust-enrichment laws to recover damages and the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of the Defendants' violations of these laws.

2.      The Court has jurisdiction over the federal claim under 28 U.S.C. §§1331 and 1337. The Court has jurisdiction over the state-law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy. The Court also has jurisdiction over the state-law claims under 28 U.S.C §1332 because the amount of the controversy for the Money-Damages class defined below exceeds $5,000,000, and Plaintiff and members of the Money-Damages class are citizens of a different state than the Defendants.

3.      Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C.§1391 because Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to Plaintiff's claims arose in this District.

4.      The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect and impact on the foreign and interstate commerce of the U.S. and on trade and commerce within the District of Columbia.

## DEFINITIONS

5.      "Graphics Processing Units and Cards" are highly specialized semiconductors and related products that increase the speed, complexity, and visual fidelity of digital images that can be displayed on electronic graphical interfaces.

6.     "Class Period" means November 30, 2002 through present.

## THE PARTIES

7.     Plaintiff, Rebecca Bly, is an District of Columbia resident who indirectly purchased one or more of the Defendants' Graphics Processing Units and Cards from one or more of the Defendants during the Class Period for end use and not for resale and was injured as a result of Defendants' illegal conduct.

8.     Defendant Nvidia Corporation ("Nvidia") is a Delaware corporation, with its principal place of business at 2701 San Tomas Expressway, Santa Clara, California 95050. During the Class Period, Nvidia manufactured, sold, and distributed Graphics Processing Units and Cards to customers throughout the U.S., including in the District of Columbia.

9.     Defendant ATI Technologies, Inc. ("ATI") is a Canadian corporation with its principal place of business at 1 Commerce Valley Drive East, Markham, Ontario, Canada L3T 7X6.  During the Class Period, ATI manufactured, sold, and distributed Graphics Processing Units and Cards to customers throughout the U.S., including in the District of Columbia.

10.     Defendant Advanced Micro Devices, Inc. ("AMD") is a Delaware Corporation with its principal place of business at One AMD Place, P. O. Box 3453, Sunnyvale, California 94088-3453.  On July 24, 2006, AMD and ATI announced a plan to merge in a deal valued at $5.4 billion.  The merger closed October 25, 2006.  The acquisition consideration included over $2 billion financed from a loan, as well as 56 million shares of AMD stock.  During the Class Period, through AMD's acquisition of ATI, AMD manufactured, sold, and distributed Graphics Processing Units and Cards to customers throughout the U.S., including in the District of Columbia.

3

11.     Various others, presently unknown to Plaintiff, participated as co-conspirators with the Defendants in the violations alleged and engaged in conduct and made statements to further and advance these violations.

## FACTUAL ALLEGATIONS

A.     *The Graphics Processing Units and Cards Industry*

12.     Throughout the Class Period, Defendants and their co-conspirators marketed and sold Graphics Processing Units and Cards throughout the U.S., including in the District of Columbia.

13.     Nvidia Corporation states on its website that it is the "worldwide leader in programmable        graphics        processor        technologies."        (<http://phx.corporate-ir.net/phoenix.zhtml?c=116466&p=irol-homeprofile>).  It further states that it creates products for computing, consumer electronics, and mobile device applications.  In its most recent Form 10Q, filed with the U.S. Securities and Exchange Commission on November 29, 2006, Nvidia stated that it has four major product-line operating segments: The graphics processing unit, or GPU Business; the media and communications processor, or MCP Business; the Handheld GPU Business, and the Consumer Electronics Business.

14.     Nvidia further states that its GPU Business is composed of products that support desktop personal computers or PCs, notebook PCs and professional workstations.  Its MCP Business is composed of Nvidia nForce products that operate as a single-chip or chipset that can off-load system functions, such as audio processing and network communications, and perform these operations independently from the host central processing unit or CPU.  Nvidia's Handheld GPU Business is composed of products that support handheld personal digital assistants, cellular phones, and other handheld devices.  Nvidia's Consumer Electronics Business concentrates in

4

products that support video game consoles and other digital consumer electronics, including Sony's PlayStation 3 and Microsoft's Xbox360 videogame consoles.

15.    The Nvidia GPU and MCP brands include Nvidia GeForce, Nvidia GoForce, Nvidia Quadro, and Nvidia nForce. Nvidia's product applications include video games, film production, broadcasting, industrial design, space exploration, and medical imaging. Nvidia further states that, "[t]he world's leading PC and Handset OEMs incorporate Nvidia technology into their products, including Apple, Dell, Fujitsu Siemens, Gateway, HP, IBM, Lenovo, LG, Medion, Mitsubishi, Motorola, MPC, NEC, Samsung, Sony Electronics, Sony Ericsson, and Toshiba." Nvidia further states that it "partners with a broad range of system builders, such as Alienware, Falcon Northwest, HCL, SAHARA and Shuttle, to deliver solutions at every price point." Additionally, Nvidia products have been adopted by the world's leading add-in card and motherboard manufacturers, including ASUS, BFG, EVGA, Foxconn, GIGABYTE, MSI, Palit, Point of View, and XFX.

16.    Defendant ATI stated in its 2005 Annual Report that it is one of the world's leading providers of graphics processors and technologies. If further stated that its "graphics processing units (GPUs) are highly specialized semiconductors that increase the speed, complexity and visual fidelity of digital images that can be displayed on graphical interfaces." ATI further stated that its products are found in desktop and notebook computers, and consumer electronics devices such as mobile phones, digital televisions, and game consoles.

17.    ATI's two primary markets for its semiconductor graphics products are the PC and consumer markets, and in the first quarter of 2005 it began to report its financial results in two segments – PC and consumer. Its PC segment includes all 3D graphics, video, and multimedia products, and chipsets developed for use in desktop and notebook computers,

including professional workstations, servers, and home-media PCs. Its consumer segment includes products used in mobile phones, PDAs, DTVs, and consumer electronics. In the PC segment, ATI's desktop GPU primary brands include Radeon (desktop products), FireGL (workstations), and All-in-Wonder (multimedia products). Its brand for notebook computer discrete products is Mobility Radeon. ATI's chipset products are targeted to motherboard manufacturers and OEMs and include the Radeon Xpress 200 integrated chipsets for the desktop and notebook markets and the Radeon Xpress CrossFire Edition chipsets designed to be used in conjunction with one or more discrete graphics chips in graphically demanding applications, such as gaming.

18.    In its consumer segment, ATI's products are designed to provide advanced visual and audio processing for color-mobile phones and other handheld devices and include ATI's Imageon product line. With respect to digital television, ATI's Xilleon and Theater products are highly integrated visual and signal processing solutions offered to DTV and set-top box manufacturers. In the game console market, the Microsoft Xbox 360 and Nintendo GameCube both utilize AIT's products.

19.    ATI sells its products through various channels and to customers including OEMs; system integrators who build ATI's products into their PCs; original-design manufacturers who add ATI's products to their PC motherboard products or graphic-board products; and traditional and online distributors and retailers.

20.    The market for the manufacture and sale of Graphics Processing Units and Cards is conductive to the collusive activity alleged, as the market is oligopolistic in nature.

21.    The market for the manufacture and sale of Graphics Processing Units and Cards is subject to high manufacturing and technological barriers to entry. Efficient fabrication plants

6

are large and costly.  Graphics Processing Units and Cards are also subject to technological advances, so that firms within the industry must undertake significant research and development expenses.

22.      The Graphics Processing Units and Cards industry has also been subject to significant consolidation during the Class Period.

23.      Defendants sell their Graphics Processing Units and Cards through various channels, including to manufacturers of electronic products and devices and to Graphics Processing Units and Cards resellers.  These electronic products and devices and Graphics Processing Units and Cards are then sold, directly or indirectly, to consumers and are not altered during the course of sale.

**B.      *Defendants' Illegal Conduct***

24.      On November 30, 2006, AMD announced that it had "received a subpoena from the U.S. Department of Justice ("DOJ") Antitrust Division in connection with the DOJ's investigation into potential antitrust violations related to graphics processors and cards." (http://www.amd.com/us-en/Corporate/VirtualPressRoom/0,,51_104_543~114493,00.html>). AMD further stated that "AMD entered the graphics processor business following the company's acquisition of ATI Technologies, Inc. last month (October 25, 2006)." *Id.*

25.      On November 30, 2006, Nvidia announced that it had "received a subpoena from the San Francisco Office of the Antitrust Division of the Department of Justice in connection with the DOJ's investigation into potential antitrust violations related to Graphics Processing Units and Cards." (<http://phx.corporate-ir.net/phoenix.zhtml?c=116466&p=irol-newsArticle&ID=937753&highlight=>).  A report in the December 1, 2006 *San Jose Mercury News* explained that "Department of Justice investigators asked Nvidia for pricing documents,

7

customer agreements and other documents, company spokesman Michael Hara said Friday. 'They have asked for a pretty big data dump that goes back to the late '90s,' Hara said. 'It's a fairly broad request.'"

(<http://www.mercurynews.com/mld/mercurynews/business/technology/16143619.htm>).

26.    A December 2, 2006 *San Francisco Chronicle* article expanded on Mr. Hara's remarks: "Michael Hara, vice president of corporate communications at Nvidia, said the Justice Department requested documents going back eight or nine years. 'It's a broad range of documents relating to customers, competitors, product stack, prices, market studies – everything, pretty much,' he said." (<http://www.sfgate.com/cgi-bin/article.cgi?file=/chronicle/archive/2006/12/02/BUGTFMNRS81.DTL&type=business>).

27.    New reports also stated that "Gina Talamona, a spokeswoman for the DOJ, said the agency is looking into possible anticompetitive practices within the 'graphics processing unit and cards' industry." (<http://news.com.com/Justice+Dept+subpoenas+AMD%2C+Nvidia/2100-1006.3-6140041.html?tag=stdh>).

28.    Moreover, regular users of Nvidia and ATI graphics cards have voiced suspicions of    price-fixing    collusion    between    the    two    companies    in    recent    years. (<http://episteme.arstechnica.com/eve/forums/a/tpc/f/174096756/m/340003858631/inc/-1>). One commentator compared the DOJ's investigation of Graphics Processing Units and Cards to its successful prosecution of manufacturers of Dynamic Random Access Memory, which has resulted in $731 million in criminal fines: "'If the DOJ wanted to, it could just go down very line in the semiconductor industry and find the same issue,' said Gartner Inc. analyst Richard Gordon. 'That's because there are a relatively few number of suppliers in the chip industry and an open flow of communication between competitors and customers, who may not define price

8

fixing      the      same      way      the      DOJ      does,'      he      said."

(<http://www.computerworld.com/action/article/do?commmand=viewArticleBasic&taxonomyN
ame=government&articleID=9005596&taxonomyID=13&intsrc=kc_top>).

29.    Similarly, in the previously cited *San Francisco Chronicle* article, "Crawford Del
Prete of International Data Corp. said the investigation is not surprising. 'I am not surprised that
(the Justice Department) is looking into this as there are few suppliers left, which aggregates
pricing power,' he said in an e-mail."

30.    Other news reports contained similar comments by analysts. According to the
*San Jose Mercury News* article quoted above, "'I have to believe this stuff traces back into
history,' said Doug Freeman, an analyst with American Technology Research. 'As a consumer, I
have noticed that the price points of video cards have always been pretty equal. The first mover
comes out with a product that is $500 and the follower comes out with a product that is $500.
They tend not be in price wars.' Ashok Kumar, an analyst with Raymond James, said the Justice
Department was possibly alerted by customers, such as PC makers or the so-called white-box
clone PC makers based in Taiwan who try to keep their prices as low as possible. 'The question
is, do prices fall with the normal trajectory of the costs?' Kumar said."

**FRAUDULENT, ACTIVE, AND SELF-CONCEALMENT**

31.    Throughout and beyond the conspiracy, Defendants and their co-conspirators
affirmatively and actively concealed their unlawful conduct from Plaintiff. Defendants and their
co-conspirators conducted their conspiracy, which by its nature is self-concealing, in secret and
kept it within the confines of their higher-level executives. Defendants and their co-conspirators
publicly provided pre-textual and false justifications regarding their price increases. Defendants
and their co-conspirators concealed the true nature of their unlawful conduct and acts in

9

furtherance of it, and actively concealed their activities through various other means and methods to avoid detection. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before commencing this litigation.

32.    As a result of Defendants and their co-conspirators' active concealment, any and all applicable statutes of limitations otherwise applicable to Plaintiff's allegations have been tolled.

## CLASS-ACTION ALLEGATIONS

33.    Plaintiff brings this class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of herself and the following class members:

### Injunctive-Relief Class

All persons and business entities in all 50 states that indirectly purchased Graphics Processing Units and Cards and/or products containing Graphics Processing Units and Cards manufactured, sold, or distributed by Defendants, for end use and not for resale, from November 30, 2002 to present.

Excluded from the Injunctive-Relief Class are Defendants, entities in which Defendants have a controlling interest, Defendants' employees, officers, or directors, Defendants' legal representatives, successors, or assigns, judicial officers who may hear the case or related persons, and jurors or related persons.

Plaintiff also brings this class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and the following class members:

### Money-Damages Class

All people and business entities in the District of Columbia that indirectly purchased Graphics Processing Units and Cards and/or products containing Graphics Processing Units and Cards manufactured, sold, or distributed by Defendants, for end use and not for resale, from November 30, 2002 to present.

Excluded from the Money-Damages Class are Defendants, entities in which Defendants have a controlling interest, Defendants' employees, officers, or directors, Defendants' legal representatives, successors, or assigns, judicial officers who may hear the case or related persons, and jurors or related persons.

34.     Plaintiff has met the requirements of Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

35.     Plaintiff does not know the exact size of the classes, since this information is in Defendants' exclusive control.  But based on the nature of the trade and commerce involved, Plaintiff believes that each class numbers at least in the hundreds and that the members of each class are geographically dispersed throughout the District of Columbia (Money-Damages Class), or alternatively, throughout the U.S. including in the District of Columbia (Injunctive-Relief Class).  Therefore, joinder of the members of each class would be impracticable, and class treatment is the superior method for fairly and efficiently adjudicating this controversy.

36.     Plaintiff's claims within the respective classes are typical of other class members' claims because all class members were injured through the uniform misconduct described and paid supra-competitive prices for products containing Graphics Processing Units and Cards without being informed that they were paying illegal and improper prices.  Accordingly, by proving her own claims, Plaintiff will presumptively prove the respective class members' claims.

37.     Common legal and factual questions among and within the respective classes exist, such as:

       a.     Whether Defendants conspired to fix, raise, maintain, or stabilize the prices of Graphics Processing Units and Cards marketed, distributed, and sold in the U.S., including in the District of Columbia;

b.  Whether Defendants conspired to manipulate and allocate the market for Graphics Processing Units and Cards marketed, distributed, and sold in the U.S. including in the District of Columbia;

c.  The existence and duration of Defendants' horizontal agreements to fix, raise, maintain, or stabilize the prices of Graphics Processing Units and Cards marketed, distributed, and sold in the U.S., including in the District of Columbia;

d.  The existence and duration of Defendants' horizontal agreements to manipulate and allocate the market for Graphics Processing Units and Cards marketed, distributed, and sold in the U.S., including in the District of Columbia;

e.  Whether each Defendant was a member of, or participated in, the arrangement, contract, or agreement to fix, raise, maintain, or stabilize the prices of Graphics Processing Units and Cards marketed, distributed, and sold in the U.S., including in the District of Columbia;

f.  Whether each Defendant was a member of, or participated in, the arrangement, contract, or agreement to allocate the market for Graphics Processing Units and Cards marketed, distributed, and sold in the U.S., including in the District of Columbia;

g.  Whether Defendants' conspiracy was implemented;

h.  Whether Defendants took steps to conceal their conspiracy from Plaintiff and the members of each class;

i.  Whether Defendants' conduct caused injury in fact to the business or property of Plaintiff and the respective class members, and if so, the appropriate class-wide measure of damages;

j.  Whether the agents, officers, or employees of Defendants and their co-conspirators participated in telephone calls, meetings, and other communications in furtherance of their conspiracy; and

k.  Whether the purpose and effect of the acts and omissions alleged was to fix, raise, maintain, or stabilize the prices of Graphics Processing Units and Cards marketed, distributed, and sold in the U.S., including in the District of Columbia, and to manipulate and allocate the market for Graphics Processing Units and Cards marketed, distributed, and sold in the U.S., including in the District of Columbia.

38.    Plaintiff can and will fairly and adequately represent and protect the respective class members' interests and have no interests that conflict with or are antagonistic to the class members' interests. Plaintiff's attorneys are experienced and competent in complex class-action and consumer-antitrust litigation.

39.    Class certification of the respective classes is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because a class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted given that:

    a.    Common questions of law and fact overwhelmingly predominate over any individual questions that may arise among or within the respective classes and, consequently, enormous economies to the court and parties exist in litigating the common issues, for each class, on a classwide basis instead of on a repetitive individual basis;

    b.    Each individual class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

    c.    Class treatment is required for optimal deterrence against, and compensation for, Defendants' wrongful conduct alleged herein; and

    d.    Despite the relatively small size of each individual class member's claim, the aggregate volume of their claims, whether considered in a national class or in a District of Columbia class, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with repetitive individual litigation, and no unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to each class.

40.    Plaintiff's claims within and among the respective classes are typical of the associated class members' claims because Defendants injured Plaintiff and the respective class members in the same manner (*i.e.,* Plaintiff and the respective class members were forced to pay

supra-competitive prices for products containing Defendants' Graphics Processing Units and Cards).

41.    Class certification is appropriate pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure because prosecution of separate actions would create a risk of adjudication with respect to individual members of the respective classes, which may, as a practical matter, dispose of other class members' interests who aren't parties to the adjudication or which may substantially impair or impede individual class members' ability to protect their interests. Separate actions prosecuted by individual class members would also create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants.

42.    Class certification, whether as a national class or a District of Columbia class, is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted on grounds generally applicable to the respective class members.

### TRADE AND COMMERCE

43.    Throughout the Class Period, Defendants and their co-conspirators engaged in the business of marketing and selling Graphics Processing Units and Cards throughout the U.S., including in the District of Columbia.  During each year of the Class Period, Defendants sold billions of dollars of Graphics Processing Units and Cards.

44.    The oligopolistic Graphics Processing Units and Cards market is conducive to the conspiracy alleged here.  The Graphics Processing Units and Cards market is subject to high entry barriers.  Efficient product fabrication plants are large and expensive.  Graphics Processing Units and Cards are also subject to technological advances, so firms within the industry must undertake significant research and development expenses.

14

45.    During the Class Period, Graphics Processing Units and Cards prices rose, due in significant part to the effects of the collusion currently under DOJ investigation.

46.    Electronic device manufacturers and Graphics Processing Units and Cards resellers purchase Graphics Processing Units and Cards directly or indirectly from Defendants and sell Graphics Processing Units and Cards-containing products to consumers, including Plaintiff and all class members.

## COUNT I
### (Applicable to the Injunctive-Relief Class)
### VIOLATION OF THE CLAYTON ACT

47.    Plaintiff repeats and re-alleges paragraphs 1 through 46.

48.    During the Class Period, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize Graphics Processing Units and Cards prices in the U.S., including in the District of Columbia, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

49.    In formulating and carrying out their illegal agreement, understanding, and conspiracy, Defendants did the following things, among others:

    a. Fixed, raised, maintained, and stabilized Graphics Processing Units and Cards prices;

    b. Allocated Graphics Processing Units and Cards markets among themselves;

    c. Rigged bids for the award and performance of Graphics Processing Units and Cards contracts; and

    d. Allocated Graphics Processing Units and Cards production.

50.    Defendants' combination and conspiracy had the following effects, among others:

15

a.   Price competition in the sale of Graphics Processing Units and Cards was restrained, suppressed, or eliminated in the U.S., including in the District of Columbia;

b.   Prices for Graphics Processing Units and Cards sold by Defendants were fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the U.S., including in the District of Columbia; and

c.   People and entities that purchased Graphics Processing Units and Cards directly or indirectly from Defendants have been deprived of the benefits of free and open competition.

51.    Graphics Processing Units and Cards are necessary to make electronic products work – products which are now used, and which will at all relevant times in the foreseeable future continue to be used, by Plaintiff and members of the Injunctive-Relief class.  Plaintiff and Injunctive-Relief class members have been injured and will continue to be injured in their business and property by having paid more, and/or by continuing to pay more, for Graphics Processing Units and Cards purchased indirectly from one or more of the Defendants than they would have paid absent Defendants' conspiracy, including paying more for Graphics Processing Units and Cards-containing products.

52.    As a proximate cause of Defendants' conspiracy, Plaintiff is entitled to an injunction against Defendants preventing and restraining Defendants' violations.

### COUNT II
### (Applicable to the Money-Damages Class)
### VIOLATION OF DC CODE §28-4501 *et seq.*

53.    Plaintiff repeats and re-alleges paragraphs 1 – 52.

54.    During the Class Period, Defendants engaged in a contract, combination, or conspiracy in restraint of trade or commerce within the District of Columbia.  In particular, Defendants conspired to fix Graphics Processing Units and Cards prices and allocate Graphics

Processing Units and Cards customers and markets.  Defendants' conspiracy lessened full and free competition in Graphics Processing Units and Cards' importation and sales into the District of Columbia and controlled Defendants' costs, which violated DC Code §28-4501 *et seq.*

55.    Defendants' conspiracy caused them to (a) fix, raise, maintain, and stabilize Graphics Processing Units and Cards prices; (b) allocate Graphics Processing Units and Cards customers and markets; and (c) caused Plaintiff and the other District of Columbia class members to pay higher prices for Graphics Processing Units and Cards that they indirectly purchased from Defendants.

56.    In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

  a. Met to discuss Graphics Processing Units and Cards customers and markets;

  b. Agreed to charge prices at certain levels and to increase or maintain prices for Graphics Processing Units and Cards sold in the District of Columbia;

  c. Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

  d. Allocated Graphics Processing Units and Cards markets and customers consistent with their illegal agreement.

57.    Defendants' conspiracy had the following effects:

  a. Graphics Processing Units and Cards price competition was restrained, suppressed, and eliminated throughout the U.S., including in the District of Columbia;

  b. Graphics Processing Units and Cards prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in the District of Columbia;

  c. Plaintiff and the other District of Columbia class members that indirectly purchased Graphics Processing Units and Cards were deprived of free and open market competition and were injured; and

     d.     Plaintiff and the other District of Columbia class members paid more than they otherwise would have for Graphics Processing Units and Cards that they purchased indirectly.

58.    Defendants' conspiracy has substantially affected and impacted trade and commerce within the District of Columbia.

59.    During the Class Period, District of Columbia consumers indirectly purchased millions of dollars of Defendants' Graphics Processing Units and Cards in the District of Columbia from Defendants.  By reason of Defendants' violations of D.C. Code §28-4501, Plaintiff and the District of Columbia class members paid significantly more for products containing Defendants' Graphics Processing Units and Cards than they would have paid absent Defendants' illegal combination and conspiracy, and, as a result, Plaintiff and the District of Columbia class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

### COUNT III
### (Applicable to the Money-Damages Class)
### UNJUST ENRICHMENT

60.    Plaintiff repeats and re-alleges paragraphs 1 through 59.

61.    As the result of Defendants' illegal agreement, contract, combination, and conspiracy, Plaintiff and the District of Columbia class members conferred a benefit upon Defendants, and Defendants received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit Defendants to retain this benefit without paying its reasonable value to Plaintiff and the class members.

18

62.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and the District of Columbia class members suffered injury and seek an order directing Defendants to return to them the amount each of them improperly paid to Defendants, plus interest.

## JURY DEMAND

63.    Plaintiff demands trial by jury on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment in the respective class members' favor and against Defendants, as follows:

A.    That this Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certify either or both classes;

B.    With respect to the Injunctive-Relief Class, that this Court rule that Defendants' conspiracy violated the Sherman Act and that injunctive relief under the Clayton Act is appropriate;

C.    With respect to the Money-Damages Class, that this Court rule that Defendants' conspiracy violated District of Columbia law and that compensatory damages, including treble damages, are appropriate;

D.    With respect to the Money-Damages Class, that this Court determine that Defendants were unjustly enriched and that restitution is appropriate;

E.    That this Court permanently enjoin Defendants from conspiring to fix Graphics Processing Units and Cards prices and allocating Graphics Processing Units and Cards markets or other injunctive relief as this Court deems appropriate;

F.    That this Court award Plaintiff post-judgment interest, her costs, and reasonable attorneys' fees; and

G.    That this Court order any other relief as it deems just and proper.

19

Dated:  March 6, 2007                    Respectfully submitted,


By:    _____

       Donna F. Solen #465098
       Gary E. Mason #418063
       **THE MASON LAW FIRM, LLP**
       1225 19th Street, NW
       Suite 500
       Washington, DC 20036
       Telephone: 202-429-2290
       Facsimile: 202-429-2294
       Email: gmason@masonlawdc.com
       Email: dsolen@masonlawdc.com



       Daniel R. Karon, Esq.
       **GOLDMAN SCARLATO & KARON, P.C.**
       55 Public Square, Suite 1500
       Cleveland, OH  44113
       Telephone:    (216) 622-1851
       Facsimile:    (216) 622-1852
       E-mail:       karon@gsk-law.com

       Krishna B. Narine, Esq.
       **LAW OFFICES OF KRISHNA B. NARINE**
       7893 Montgomery Avenue, Suite 300
       Elkins Park, PA 19027
       Telephone:    (215) 782-3240
       Facsimile:    (215) 782-3241
       E-mail:       knarine@kbnlaw.com

       Isaac L. Diel, Esq.
       **SHARP McQUEEN McKINLEY McQUEEN
          & DODGE, PA**
       Financial Plaza
       6900 College Boulevard, Suite 285
       Overland Park, KS  66211
       Telephone:    (913) 661-9931
       Facsimile:    (913) 661-9935
       E-mail:       dslawkc@aol.com

       Gordon Ball, Esq.

20

**BALL & SCOTT**
Suite 750, Bank of America Center
550 Main Street
Knoxville, TN 37902
Telephone:     (865) 525-7028
Facsimile:     (865) 525-4679
E-mail:         gball@ballandscott.com